TELE'A FALEALI'I, PENI FAILAUTUSI, LIVINGSTONE PEDRO, SAUMOLA PEDRO, TAITO TAUANU'U, and VAGANA FALEALI'I, Plaintiffs

v.

SAVEA ROPATI SAVUSA, REV. FA'AVAE FA'ATA'ITA'I, and SILIFAIVA FAI'AI, Defendants

High Court of American Samoa
Trial Division

CA No. 100-88

June 14, 1989

Before KRUSE, Chief Justice, VAIVAO, Associate Judge, TUIAFONO, Associate Judge.

Counsel: For Plaintiff, Charles Ala'ilima
For Defendants, Togiola T.A. Tulafono

The parties are all members of the Christian Congregational Church of Matu'u and Faganeanea (hereinafter referred to as the "church"). A dispute arose among the members stemming essentially from differences relating to church government and the management and use of church property. Plaintiffs, joined by a large number of sympathizers who signed the complaint, were aggrieved with what they perceived as increasing domination of the church's affairs by the minister,

Rev. Fa'avae, and ranking Orator Savea. They complain that major property decisions were being made by the minister and Savea without the customary opportunity for input from the congregation. Testimony had it that during a confrontation between plaintiff Taito and defendant Savea, the latter justified his authority to dictate church affairs by reason of his traditional authority within the village council. By the same token, Rev. Fa'avae maintained that his active leadership with church property matters was consistent with his role as minister. Plaintiffs, on the other hand, claim that the secular affairs of the church were always handled by committees established with the approval of the congregation, and that major decisions were habitually referred to the congregation at regular business meetings which the minister would convene after Sunday worship. The minister was seen by plaintiffs as frustrating these review opportunities of the congregation by his failure to convene further business meetings. Instead, decisions were merely announced to the congregation by either Savea or the minister. The manner of decision making in connection with the demolition of the old church building and the construction of a new facility fomented the discontent.

Following a written complaint of plaintiffs and their followers, the minister was relieved of his duties by the elders of the Christian Congregational Church of American Samoa (hereinafter referred to as the "CCCAS").[1] This prompted an angered reaction from defendant Savea to disavow the CCCAS elders and turn the church Methodist in denomination. The situation eventually escalated into a split among the members with separated Sunday worship although the defendants, on the other hand, attempted to maintain the appearance of business as usual. Plaintiffs then filed suit seeking to enjoin any action to change denomination. They further seek an accounting from the defendants of all church property and funds, and, pending such accounting, plaintiffs further pray to enjoin the further

---

[1] The church at Faganeanea and Matu'u is, like many other village congregations, affiliated with the Christian Congregational Church in American Samoa which has its principal offices at Kananafou, Tafuna, American Samoa. The membership adheres to and practices the tenets of faith as established by the CCCAS general assembly in which the church has representation. The CCCAS also certifies ministers for its affiliates.

dissipation of church assets, including the expenditure of church funds.

Subsequent to the filing of suit, Savea retracted his secessionist threat after apologizing to, and making peace with, the CCCAS elders. Savea has also been instrumental in a number of reconciliation overtures to plaintiffs; however, the latter first insisted that defendants provide an accounting of church property before there could be a meaningful reconciliation. Although that accounting was not immediately supplied, the defendants finally acceded, pursuant to discovery requests, just prior to trial. As a result, the actual trial herein largely turned on the adequacy of that accounting.

### Findings

On the evidence before us, we conclude that the defendants have satisfactorily made an accounting of church property and funds. With a few minor exceptions, we find no evidence of the suspected widespread abuse or misuse of church assets by the defendants. The evidence did show that certain church property (cash and household furnishings) was donated by the defendants and their followers to Rev. Fa'avae and his family on the occasion of the minister's departure from the village. We are also satisfied that the defendants had divided the pews of the old church building among themselves and that a few bags of cement belonging to the church were removed by certain members of the Savea family for use on Savea's own home. These discrepancies do not justify the expense of another accounting.

The remaining area of quarrel has to do with the authority to make decisions concerning the use of church property --- an issue which has taken root because of confusion about church government. We proceed on the basis that a schism does not exist among the membership and accordingly we accept that Orator Savea has abandoned any ideas about seceding. On the evidence, we are satisfied that the church is in nature strictly congregational or independent in government make-up. As a congregational body, the temporal affairs of the church would generally vest in that form of government established by the congregation or membership. Watson v. Jones, 80 U.S. (13 Wall.) 666 (1871). The Supreme Court here explained that

112

a congregational organization may be governed "either by a majority of its members or by such other local organism as it may have instituted." Id. at 675. With regard to the question of entitlement to use church property, the Court further stated that "[i]f the principle of government . . . is that the majority rules then the numerical majority of members must control the right to the use of the property. If there be within the congregation officers in whom are vested the powers of such control, then those who adhere to the acknowledged organism by which the body is governed are entitled to the use of the property." Id.

Our cue then from Watson is first to identify the church's governing body, but our approach to this issue must be guarded nonetheless. Just as the First Amendment prohibits our delving into church property disputes which entail the consideration of doctrinal questions, it has also been stated that "where the identity of the governing body or bodies that exercise general authority within a church is a matter of substantial controversy, civil courts are not to make the inquiry into religious law and usage that would be essential to the resolution of the controversy." Eldership v. Church of God at Sharpsburg, 396 U.S. 367 (1970) (Brennan, J., concurring), 369-370. See also Serbian Orthodox Diocese v. Milivojevich, 426 U.S. 696 (1976); Presbyterian Church v. Hull Church, 393 U.S. 440, 449 (1969).[2]

In the present matter, a possible area of First Amendment concern might be seen in Rev. Fa'avae's contention that his involvement with the

---

[2] In such a case, the court would attempt to apply the "neutral principles of law" approach announced in Presbyterian Church v. Hull Church, 393 U.S. 440 (1969) and developed in Jones v. Wolf, 443 U.S. 594 (1979). In Jones the court in its discussion of the "neutral principles of law" approach to property disputes stated: "The primary advantages of the neutral-principles approach are that it is completely secular in operation, and yet flexible enough to accommodate all forms of religious organization and polity. The method relies exclusively on objective, well-established concepts of trust and property law familiar to lawyers and judges. It thereby promises to free civil courts completely from entanglement in questions of religious doctrine, polity, and practice." Id. at 603. Nonetheless, "general principles of property law may not be relied upon if their application requires civil courts to resolve doctrinal issues." Eldership v. Church of God at Sharpsburg, supra, at 370 (Brennan, J., concurring).

church's secular affairs is an aspect of his role as minister. Arguably, the scope of a minister's role is a matter with ecclesiastical overtones. However, we are quite clear on the evidence that Rev. Fa'avae's views were not premised on anything relating to religious law or usage. Indeed, the minister explained his role understanding primarily on the basis of his own experience. He testified that at his previous assignment, he was able to involve himself extensively with management of temporal matters without any objection from that congregation. On the other hand, a review of plaintiffs' complaint to the elders and the latter's reply memorandum of October 20, 1988, reveals that the minister was cited by the elders for, among other things, his dominant role in the church's secular affairs, resulting in a split in the congregation, to the detriment of his pastoral function. It is therefore very clear that Rev. Fa'avae's views are singularly held, and, in essence, they are nothing more than subjective conclusions on his part quite unrelated to any concerns of religious doctrine and practice. While we accept counsel's argument that a certain measure of deference has been traditionally accorded by the congregation to the minister (he has been recognized within the village with a symbolic salutation), that deference should not be confused with absolute power to govern.

We also reject any claims to the effect that the power to govern church affairs is vested in certain matai by virtue of their traditional rank within the village. As we have seen from Watson, supra the source of government power in a congregational type church is the congregation itself. There is no inherent ecclesiastical governing power in the matai simply by virtue of their traditional, and secular, office of matai. The traditional respect accorded to matai by reason of their rank should not be similarly confused with absolute power to govern church affairs.

We find on the evidence as follows: The congregation has from time to time vested certain decision making authority in ad hoc working committees. The scope of that authority is naturally limited to the purposes for which a committee is formed. Those committees have comprised not only members of the congregation, but also the incumbent minister. At the same time, there is an established procedure for business

114

meetings of the congregation. The congregation has certain reserved powers to approve or disapprove committee action.

## Conclusions

Having said as much, we must also note that no one witness had any specific idea as to details of church government. The church did not have any established rules (written or otherwise) of government which the Court could look at and objectively identify its governing entity. Indeed, the present confusion with the parties may be simply attributed to the fact that the church does not have an operating manual, so to speak, to guide its present membership. (With noticeable despair, one of the plaintiffs conceded as much on the stand). In these circumstances, the church had been able to function while the congregation was still cohesive through the ad hoc establishment of working committees. In a time of dissension, however, the result has been that situation of suspicion and disorder which the congregation now encounters.

As details of ecclesiastical government are not evident, we are enjoined from further inquiry into matters which are essentially policy development considerations properly within the congregation's bailiwick. Watson, supra. In terms of the power dispute before us, our inquiries are necessarily limited. We have first identified the source of governing power within the church as a congregational body. At the same time we have ruled out those claims to power inconsistent with that conclusion. That is, neither the minister nor the matai has inherent authority to govern independent of the congregation. This is not to say, however, that the governing power may not have been invested by the congregation in the minister or the matai. The evidence was simply far from clear as to precisely where the governing power lay. That is a matter for the congregation to define.

Finally, we consider the disputed disposal by the defendants of that church property, above listed, following the split. Applying "neutral principles of law," we hold that the defendants' division of pews among themselves and their followers was unlawful, and restitution must accordingly be made to the church. Similarly, the

church's cement which was used for a private project of the Savea family must be replaced.

With regard to the property given to the minister and his family upon their departure from the church, we are satisfied on the evidence that this action has precedent and represents a traditional farewell practice within CCCAS congregations. The questioning of such action is more appropriately a concern for the congregation rather than the civil courts.

Judgment is entered accordingly. Petition for accounting and injunctive relief is denied.

It is so Ordered.